**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| BRADLEY HAMILTON and | ) | |
| ELIZABETH HAMILTON, | ) | |
| individually, and as the parents | ) | |
| and guardians of AA, a minor, | ) | |
| and AA, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 20 C 0292 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| OSWEGO COMMUNITY UNIT | ) | |
| SCHOOL DISTRICT 308 and | ) | |
| OSWEGO COMMUNITY UNIT | ) | |
| SCHOOL DISTRICT 308 | ) | |
| BOARD OF EDUCATION, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Bradley and Elizabeth Hamilton requested special education services for their

daughter ("AA"), who attended elementary school in the Oswego school district. But the

relationship between the parents and the school district quickly deteriorated. After the parents

complained about the IEP process, the school district allegedly retaliated against them. The next

day, a school official searched the child, and then (according to the complaint) made a false

complaint about potential child abuse to the Illinois Department of Children and Family Services

("DCFS"). Other "bad faith" complaints to DCFS followed.

The parents and the child filed suit against the Oswego Community Unit School District

308 and its Board of Education (collectively, the "District"), alleging retaliation. Defendants

responded by filing a motion to dismiss and to strike. For the reasons stated below, the motion is

granted in part and denied in part.

**Background**

Bradley and Elizabeth Hamilton are the parents of AA, a minor. *See* First Am. Cplt., at ¶ 1 (Dckt. No. 20). During the 2017–2018 school year, AA was five years old and attended elementary school (presumably kindergarten) in the Oswego Community School District. *Id.* at ¶¶ 2, 16. The school district covers an area west of Chicago and contains thirteen elementary schools, as well as a number of middle schools and high schools. *See* Community Unit School District 308: Our District, archived at https://perma.cc/3JYB-MELN (last visited February 24, 2021).

AA has a disability – she is "hearing impaired / hard of hearing." *See* First Am. Cplt., at ¶ 9 (Dckt. No. 20). As a result, she qualified for and received special education services from the District. *Id.*

Under the Individuals with Disabilities Education Act, school districts must prepare an Individualized Education Program – often called an "IEP" – for each child who receives special education services. *See* 20 U.S.C. § 1414. "Prepared at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled child, the IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311 (1988).

During the 2017–2018 school year, Bradley and Elizabeth Hamilton attended a number of meetings with the school district about their daughter's need for special services. *See* First Am. Cplt., at ¶¶ 11, 13, 15, 17 (Dckt. No. 20). The complaint does not reveal how many meetings there were, or when they took place. At least one social worker participated on behalf

of the District.  *Id*. at ¶ 17.  From the parents' perspective, the goal of the meetings was to "secure special education services and accommodations for AA."  *Id*. at ¶ 4; *see also id.* at ¶ 10.

For whatever reason, the meetings became "contentious."  *Id*. at ¶ 13.  Things took an especially sour turn during a two-day meeting that took place from January 15–16, 2018.  *Id*. at ¶ 15.  The parents accused the District of violating the law by using pre-populated forms.  *Id*. at ¶ 17.

"Plaintiffs confronted and notified defendants that they violated the law by, without limitation, using pre-populated forms during the IEP meeting that included information, rights and responsibilities that could not have been drafted or agreed upon until after completion of, and participation by both sides, in the IEP meeting."[1]  *Id*.  The use of the phrase "without limitation" suggests that the parents accused the District of "violat[ing] the law" in other ways, too.  *Id.*

Reading between the lines, the parents apparently believed that the school officials weren't listening to them.  Perhaps they thought that the District had pre-ordained what they were going to do without hearing from the parents first.  Maybe the parents felt that the District was simply going through the motions and holding a *pro forma* meeting.

The accusation of illegality landed poorly with the Oswego educators.  The school representatives and the social worker "became very defensive and combative."  *Id*.

---

[1]  It is not immediately obvious why using pre-populated forms would violate the law.  The "pre-populated" forms might have constituted a working draft of AA's IEP.  Presumably the statute doesn't prohibit the District from bringing something concrete to discuss.  The parents do not allege that the District refused to make changes to the draft after the meeting, or forced the parents to agree to something that they opposed, or otherwise failed to participate in the meeting in good faith.  Maybe the draft contained inaccurate information, but if so, the solution would be to correct it.  Even if the working draft reflected an agreement that the parties had not yet reached (for example, maybe the form said that the "parents agreed to X at the meeting on January 15–16," before the meeting took place), the parties presumably could have changed the draft after the meeting if there was a disagreement.  Maybe discovery will shed more light on what the parents viewed as problematic.

According to the complaint, Defendants responded to that accusation by retaliating against the parents.  They performed an unauthorized search of AA's body, and then made a "bad faith" complaint to the Illinois Department of Children and Family Services (again, "DCFS") about the treatment of the child.  *Id*. at ¶¶ 3, 12, 13, 25.

The search took place on January 17, 2018, the day after the contentious meeting.  *Id*. at ¶¶ 13, 16.  AA went to school.  *Id.*  The social worker who attended the IEP meetings then conducted an "unlawful search" of AA "on school grounds, during school hours."  *Id*. at ¶ 16.  The District did not request or receive consent from the parents to search their child.  *Id.*  In fact, the school did not notify the parents in advance that the search was going to take place at all.  *Id.*

Based on the search, the social worker claimed that she discovered a "three (3) inch bruise on AA's right hip."  *Id.*  According to Plaintiffs, that discovery would have required an invasive body search.  A bruise on her hip "would not have been visible to Defendants without taking down or removing AA's pants below her buttocks."  *Id.*

After discovering the bruise, the social worker made a "hotline call" to DCFS.  *Id*. at ¶ 17.  Under Illinois law, social workers are "mandatory reporters," which means that the law requires them to "immediately report" to DCFS if they have "reasonable cause to believe a child known to them in their professional or individual capacity may be an abused or neglected child."  *Id.* at ¶ 32; *see also* 325 ILCS 5/1 *et seq.*; *Sebesta v. Davis*, 878 F.3d 226, 231 (7th Cir. 2017).

According to the complaint, the social worker called DCFS in "bad faith."  *See* First Am. Cplt., at ¶¶ 3, 12, 13, 25 (Dckt. No. 20).  As the parents see it, the reason for the call was not concern for the child.  Instead, the real reason was a desire to get back at the parents for complaining about the IEP process and accusing the District of illegality.

When DCFS investigators showed up at Plaintiffs' home, "Elizabeth Hamilton told the investigators the hotline call was made in retaliation for the parents' advocacy during the IEP process." *Id.* at ¶ 18. Allegedly, her statement "was reported back to Defendants." *Id.*

Things spiraled downward in the days that followed. Representatives from the District who participated in the IEP meetings "made several other reports to DCFS regarding suspected abuse and neglect." *Id.* The reports included "alleged abuse and neglect which had supposedly occurred prior to the IEP but which defendants had not previously reported to DCFS." *Id.* The complaint stops short of putting in the public record the nature of the allegations of abuse. Suffice it to say that "Defendants accused Brad Hamilton and another family member of unspeakable and lascivious acts on AA (a 5-year old girl)." *Id.* at ¶ 19.

At some point, the family moved out of the school district. *Id.* at ¶ 20. The complaint does not reveal what, if anything, came of the complaints to DCFS.

Bradley and Elizabeth Hamilton, as well as AA herself, ultimately filed this lawsuit against the Oswego Community Unit School District 308 and its Board of Education. The complaint includes three counts.

Count I is a retaliation claim under the Rehabilitation Act. *See* 29 U.S.C. § 749 *et seq.* Plaintiffs allege that they engaged in protected activity by requesting special services for AA, and that Defendants responded by performing an illegal search and contacting DCFS in bad faith.

Count II is a retaliation claim under the Americans with Disabilities Act. *See* 42 U.S.C. § 12101 *et seq.* The core allegation is the same – Defendants retaliated against the family by searching the child and contacting the child welfare agency for no legitimate reason.

Count III is a *Monell* claim under section 1983. The complaint alleges that Defendants have "created a pattern and practice of retaliating against other parents who have communicated to and made demands upon Defendants concerning their children's education in the school district." *Id.* at ¶ 31. The retaliation consists of "alleging that the parents have injured, abused, or neglected their children." *Id.*

The parents allege that their experience was not a one-time incident. *Id.* at ¶¶ 30–34. They claim that the District has retaliated against other families, too. They point to another federal lawsuit filed in the Northern District of Illinois. *Id.* at ¶¶ 30–31 (citing *Peoples v. Oswego Community School District*, No. 19-cv-568). In *Peoples*, a father and daughter allege that the father met with the principal of his daughter's school about "bullying, unfair treatment and unequal treatment toward his daughter." *See* Second Am. Cplt., at ¶ 9, in *Peoples v. Oswego Community School District*, No. 19-cv-568 (Dckt. No. 67). In response, school officials allegedly made false or exaggerated reports to DCFS about his behavior. DCFS responded by coming to the school and strip searching the child without her father's permission.

In the case before this Court, the *Monell* claim relies exclusively on the *Peoples* case to allege that there is a pattern or practice of complaining to DCFS in bad faith. *Id.* at ¶ 30. There's nothing else, except "information and belief." *Id.* at ¶ 31.

According to Plaintiffs, the District has "weaponize[d]" the mandatory reporting to DCFS. *Id.* at ¶ 33. Instead of using the process to protect children, Defendants allegedly "wield it as a veil or shield of impunity to silence and intimidate outspoken parents and other parents." *Id.*

**Analysis**

Defendants moved to dismiss the claims, and moved to strike the demand for punitive damages. They advance three arguments.

First, Defendants contend that it is too difficult to tell what claims AA is making in her personal capacity. The complaint refers to AA as a plaintiff, but Counts I and II read as if the parents alone are bringing the claims. So Defendants think that AA's claims, whatever they are, should be dismissed because they lack clarity.

Second, Defendants argue that the complaint does not contain sufficient facts to allege a retaliation claim under either the ADA or the Rehabilitation Act, or sufficient facts to state a *Monell* claim under section 1983.

Third, Defendants move to strike the demand for punitive damages because they are not available under any of the statutes at issue.

## I.     The Claims by the Child

First, Defendants move to dismiss all of AA's claims under Rule 12(b)(6) because it is difficult to decipher what, exactly, she is alleging in her own capacity. *See* Defs.' Mtn. to Dismiss, at ¶¶ 7–11 (Dckt. No. 26). The Court agrees that the complaint would benefit from additional clarity.

There is no doubt that the complaint includes AA as a plaintiff. Her name appears in the caption, and the first paragraph of the complaint states that "Plaintiffs, Bradley Hamilton and Elizabeth Hamilton, individually and as the parents and guardians of AA, a minor, *and AA* . . . bring this lawsuit." *See* First Am. Cplt., at ¶ 1 (Dckt. No. 20) (emphasis added). The following paragraphs allege that Defendants "conducted an unlawful search of AA," which means that AA herself suffered an injury. *Id*. at ¶ 12.

But when it comes to the allegations in Counts I and II, the complaint speaks from the perspective of the parents. It reads like the parents are the plaintiffs, and AA is the subject of their claims (but not a claimant herself).

Counts I and II advance claims for unlawful retaliation under the ADA and the Rehabilitation Act. To state a retaliation claim, *each* plaintiff must show "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) a causal connection between the two." *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011); *see also Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 641 (7th Cir. 2015) ("Matthew's allegation focuses on actions the District took against his parents after they attempted to assert their own statutory rights concerning his education. Crucially, Matthew does not say that the District retaliated against him based on any protected action that *he* took.") (emphasis in original). A plaintiff can suffer an adverse action through the mistreatment of a third party. For example, a defendant could retaliate against a member of the plaintiff's family. But the retaliation must be the kind of thing that would "dissuade a reasonable person" in the *plaintiff's* position "from engaging in [the] protected activity." *Henry v. Milwaukee Cty.*, 539 F.3d 573, 586 (7th Cir. 2008); *see also Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011) (concluding that firing an employee's fiancée, after the employee engaged in a protected activity, would constitute an adverse action against the employee).

Both counts sound like the parents are the only plaintiffs. The complaint describes the protected activities from the perspective of the parents: "[a]dvocating *for* a disabled student" and "[r]equesting accommodations *for* a disabled student." *See* First Am. Cplt., at ¶¶ 24, 27 (Dckt. No. 20) (emphasis in original). "Plaintiffs advocated *for* AA" to secure appropriate services. *Id.* "Making a bad faith hotline call and performing an illegal search of a five-year old child is

reasonably likely to deter *parents* from engaging in protected activity." *Id.* at ¶¶ 25, 28 (Dckt. No. 20) (emphasis in original).

The complaint does refer to "*her*" – that is, AA's – right to a free and appropriate education, and it alleges that AA was searched. *Id.* at ¶¶ 24, 25, 27, 28. Still, there is room to sharpen the theory of retaliation. Maybe the theory is that Defendants retaliated against the child because of something said by her parents on her behalf – say, by searching her, or by sending DCFS to talk to her parents. If so, then the complaint should say so more expressly.

It is not entirely clear what protected activity AA, as opposed to her parents, engaged in. It is also unclear whether the complaint is alleging that the parents are asserting their own rights, or also the rights of their child. For example, it is uncertain if the complaint is alleging that AA (herself) engaged in a protected activity when her parents – acting on her behalf – requested special educational services. Maybe the parents were asserting their rights as parents, or maybe they were asserting AA's rights on her behalf. Or maybe both.

In a similar vein, it is unclear if the complaint is claiming that the District retaliated against AA (personally) for her own assertion of her educational rights, or perhaps for her parents' assertion of their rights as parents. Was the search an act of retaliation against *AA* for AA's assertion of her educational rights? Or, an act of retaliation against the parents (only)? Similarly, is the theory that the District retaliated against *AA* by calling DCFS? Or, was that call an act of retaliation against the parents (only)? The complaint could use more clarity to align the protected activity and the retaliation.

Count III, the *Monell* claim under section 1983, focuses on the parents, too. The title of Count III reads: "Unwritten Policy or Custom to Retaliate with Bad Faith DCFS Reporting Against *Parents* Who Exercised Protected-Speech." *See* First Am. Cplt., Count III (Dckt. No.

20) (emphasis added). The paragraphs that follow focus on the parents, too. "Defendants have created a pattern and practice of retaliating *against other parents* who have communicated to and made demands upon defendants concerning their children's education in the school district." *Id.* at ¶ 31 (emphasis added). "The retaliation has taken the form of making to DCFS bad faith reports *against the parents . . . .*" *Id.* (emphasis added). The District exploits the confidential process for complaining to DCFS by using it to "silence and intimidate outspoken *parents* and other *parents*." *Id.* at ¶ 33 (emphasis added). Unlike Counts I and II, the *Monell* claim does not mention the search – the injury most directly sustained by AA herself.

A complaint "need not set out either legal theories or comprehensive factual narratives." *See Rapid Test Prods., Inc. v. Durham Sch. Servs., Inc.*, 460 F.3d 859, 860 (7th Cir. 2006). But it does need to "give the defendant fair notice of what the . . . claim[s] [are] and the grounds upon which [they] rest[]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

If the theory for AA's claims is different than the theory for the parents' claims, then Plaintiffs should consider putting the claims in separate counts. The complaint seems to involve the same set of circumstances, so separating the child's claims from the parents' claims might not be strictly necessary. Still, Rule 10(b) does favor clarity: "If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense." *See* Fed. R. Civ. P. 10(b). Separating the child's claims and the parents' claims might help "frame the issues and provide the basis for informed pretrial proceedings." *Stanard v. Nygren*, 658 F.3d 792, 797 (7th Cir. 2011) (cleaned up).

Defendants seek dismissal, but that request goes too far. If the lack of clarity is the problem, then more clarity is the solution. "The remedy for an allegation lacking sufficient specificity to provide adequate notice is, of course, a Rule 12(e) motion for a more definite statement." *See Twombly*, 550 U.S. at 590 n.9 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

The Court treats the motion to dismiss as a motion for a more definite statement under Rule 12(e), which is granted. *See* Fed. R. Civ. P. 12(e) ("A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response."). Rule 12(e) is the "right way to ask plaintiffs to lay out details that enable the defendants to respond intelligently and the court to handle the litigation effectively." *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 849 (7th Cir. 2017); *see also Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 665 (7th Cir. 2007); *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 911 (N.D. Ill. 2007). Sharpening the complaint and bringing the claims into tighter focus will help everyone.

The Court grants Plaintiffs leave to file an amended complaint by March 19, 2021, and bring the allegations and claims by AA into sharper focus. If AA is bringing retaliation claims and a *Monell* claim in her personal capacity, then the amended complaint must say so more expressly, and it must allege sufficient facts to state a claim.

## II. The Claims by the Parents

Next, Defendants move to dismiss the parents' claims, arguing they have failed to state a plausible claim under the ADA, the Rehabilitation Act, or section 1983.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.

1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotation marks and citation omitted); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief").

A court begins by "taking note of the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). The court must "accept the well-pleaded facts in the complaint as true." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 681). But a court must ignore "legal conclusions and conclusory allegations merely reciting the elements of the claim." *Id.*

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. That is, a complaint must tell "a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Otherwise, the complaint fails to state a claim and must be dismissed. *See Iqbal*, 556 U.S. at 678.

### A. ADA and Rehabilitation Act Claims

"Both the Rehabilitation Act and the ADA make it unlawful to retaliate for the exercise of rights conferred by those statutes." *Stanek*, 783 F.3d at 641. Recall, to state a claim for retaliation under the ADA or the Rehabilitation Act, a plaintiff must allege that (1) she engaged in a protected activity, (2) the defendant took an adverse action against her, and (3) a causal connection existed between the protected activity and the adverse action. *See Dickerson*, 657 F.3d at 601. An action is considered "adverse" if it "would dissuade a reasonable person from

12

engaging in [the] protected activity." *Henry*, 539 F.3d at 586. Again, mistreatment of a third party (like a family member) can give rise to a claim if it would dissuade a reasonable person in the *plaintiff's* position from engaging in the protected activity. *See Thompson*, 562 U.S. at 174.

All parties agree that the Hamiltons have alleged that they engaged in a protected activity under both the ADA and the Rehabilitation Act: asking "a school to accommodate a child's disability." *Stanek*, 783 F.3d at 643; *see also A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013) (collecting cases).

Their disagreement revolves around the next two elements: whether Defendants took an adverse action against the parents, and whether they took that adverse action *because* the parents had engaged in a protected activity.

The Hamiltons allege that the Defendants took adverse action against them in three ways. First, a social worker engaged in an "unlawful search" of AA and claimed to find a three-inch bruise on her hip. Second, the social worker called DCFS in "bad faith" to report suspected abuse and neglect. Third, "several different employees and authorized agents who were directly involved as participants in the contentious IEP meetings" called DCFS in "bad faith" to report suspected abuse and neglect, including abuse and neglect that took place before the IEP meetings. *See* First Am. Cplt., at ¶¶ 16–18 (Dckt. No. 20). At least some of those reports accused Brad Hamilton and another family member of "unspeakable and lascivious acts on AA." *Id*. at ¶ 19.

Defendants do not disagree with the notion that conducting an invasive search of a parent's five-year-old child is an adverse action. And rightly so. It is a physical act involving a young child, without the parents' knowledge or consent. That's exactly the kind of thing that might dissuade parents from engaging in protected activity.

13

Likewise, Defendants don't deny that placing *bad faith* calls to DCFS is an adverse action. Again, rightly so. "Having a government official appear at their door armed not only with the power to take their disabled child away but also with allegations that they are actively . . . abusing that child would surely be enough to dissuade many reasonable parents from seeking accommodations at school." *Shelby Cty. Bd. of Educ.*, 711 F.3d at 698. Few things are more precious to a parent than a continuing relationship with a child.

Instead, Defendants argue that the parents haven't pleaded enough facts to support an allegation that they placed the calls *in bad faith*. *See* Defs.' Mtn. to Dismiss, at ¶¶ 37–45 (Dckt. No. 26). They argue that a heightened pleading standard applies to the allegation that the District acted in "bad faith." And as they see it, the allegations of a "bad faith" call to DCFS are too conclusory to pass muster.[2]

The argument about the heightened pleading standard comes from a state statute, the Illinois Abused and Neglected Child Reporting Act ("ANCRA"). *See* 325 ILCS 5/1 *et seq.* Under that statute, all social workers and other school personnel are "mandated reporters." *See* 325 ILCS 5/4(a)(2), (4); *see also Sebesta v. Davis*, 878 F.3d 226, 231 (7th Cir. 2017). The Act requires them to "immediately report" to DCFS if they have "reasonable cause to believe that a child known to them in their professional or official capacities may be an abused child or a neglected child." *See* 325 ILCS 5/4(a). ANCRA gives mandated reporters certain protections as well. Section 9 provides that mandated reporters "shall have immunity from any liability, civil, criminal or that otherwise might result" from reports made in "good faith." *See* 325 ILCS 5/9.

---

[2]  Defendants make this argument in a section about the *Monell* claim (Count III), not the retaliation claims (Counts I and II). Later, when discussing the retaliation claims, they included a sentence about the "District's required compliance with ANCRA and the statutory presumption of good faith, discussed previously in this motion." *See* Defs.' Mtn. to Dismiss, at ¶¶ 55, 57 (Dckt. No. 26). So, the Court reads the argument about the state statute to apply to the retaliation claims, too.

And "[f]or the purpose of any proceedings, civil or criminal," the good faith of mandated reporters is "presumed." *Id*.

Defendants invoke that state statute as the basis for a heightened pleading standard. Basically, Defendants attempt to use state substantive law to elevate federal pleading standards. They argue that "Plaintiffs have not pleaded any facts to overcome this presumption" of good faith. *See* Defs.' Mtn. to Dismiss, at ¶ 43 (Dckt. No. 26). The argument goes off the rails in a hurry.

The Federal Rules of Civil Procedure, not state statutes, govern pleading requirements in federal court. State law does not control federal procedure. *See* Fed. R. Civ. P. 1 ("These rules govern the procedure in all civil actions and proceedings in the United States district courts."); 5 Arthur R. Miller *et al*., *Federal Practice and Procedure* § 1204 (3d ed. 2020) ("The manner and details of pleading in the federal courts are governed by the Federal Rules of Civil Procedure regardless of the source of substantive law to be applied in the particular action."). The Federal Rules control the procedure in federal question cases (like this one) and in diversity cases, too. *See Johnson v. Hondo, Inc.*, 125 F.3d 408, 417 (7th Cir. 1997) ("[I]t is rudimentary that pleading requirements in the federal courts are governed by the federal rules and not by the practice of the courts in the state in which the federal court happens to be sitting."). "[F]ederal rules always control in federal court." *Whitlock v. Deloitte & Touche, LLP*, 233 F.3d 1063, 1065 (7th Cir. 2000); *Mayer v. Gary Partners and Co., Ltd.*, 29 F.3d 330, 334 (7th Cir. 1994); *Jenkins v. Vill. of Maywood*, 506 F.3d 622, 624 (7th Cir. 2007). A state statute has no power to raise federal pleading standards.

Notice pleading is the default rule under the Federal Rules. Pleading with particularity is not. The Federal Rules specifically define when a party must satisfy heightened pleading

15

standards. Rule 9(b) elevates the pleading requirements for claims of "fraud or mistake," but this case does not involve fraud or mistake. *See* Fed. R. Civ. P. 9(b).

Plaintiffs allege that the District called DCFS in bad faith, which calls into question their state of mind. But Rule 9(b) flattens any notion that there is a heightened pleading standard for state of mind. "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* The Federal Rules entitle a party to allege state of mind "generally," so the complaint at issue passes muster.

And even then, a state statute cannot immunize conduct that violates federal law, or raise the bar for what it takes to bring a federal claim. *See Hampton v. City of Chicago*, 484 F.2d 602, 607 (7th Cir. 1973) ("A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced."); *Sebesta v. Davis*, 2016 WL 232380, at *8 (N.D. Ill. Jan. 20, 2016), *aff'd,* 878 F.3d 226 (7th Cir. 2017) ("Because ANCRA is a state statute, it cannot protect Defendants from Sebesta's federal constitutional claims."). Federal law, not state law, governs what it takes to plead and prove retaliation under a federal statute.

The third element of a claim for retaliation is a causal connection between the protected activity and the adverse action. *See Stanek*, 783 F.3d at 641. The complaint relies heavily on the timing. The contentious meetings took place on January 15–16, and the search took place the very next day. *See* First Am. Cplt., at ¶¶ 13, 15, 16 (Dckt. No. 20). More calls followed that unruly meeting, too. According to Plaintiff, the close *temporal* connection suggests that there was a close *causal* connection.

Suspicious timing can support a retaliation claim. *See Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). It is a piece of the puzzle, but it rarely gives enough of a picture to get to a jury. "Under our caselaw, '[s]uspicious timing is rarely enough to create a triable issue.'" *Igasaki v. Illinois Dep't of Fin. and Prof'l Regulation*, 2021 WL 613425, at *7 (7th Cir. Feb. 17, 2021) (citation omitted).

But the case is not at the summary judgement stage. For now, the timing supports a plausible inference that Defendants took the adverse actions *because* the parents advocated for AA. The parties can explore causation in discovery.

### B.   *Monell* Claim

Finally, Plaintiffs also bring a *Monell* claim under section 1983. "Section 1983 provides a claim against a person acting under color of law who deprives another of a federal right." *Swanigan v. City of Chicago*, 881 F.3d 577, 582 (7th Cir. 2018). Units of local government, including school districts, are "persons" for the purpose of § 1983 and can be held directly liable for damages. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *see also Howell v. Wexford Health Sources, Inc.*, 2021 WL 405006, at *3 (7th Cir. Feb. 5, 2021). However, they can only be held liable for their own actions, not the actions of their employees on a theory of respondeat superior. *See Monell*, 436 U.S. at 691.

A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act is directly caused by: "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). "In other words, to maintain a § 1983 claim against a municipality, one must establish the requisite culpability (a 'policy or

custom' attributable to municipal policymakers) and the requisite causation (the policy or custom was the 'moving force' behind the constitutional deprivation)."  *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).

Here, Plaintiffs bring their claims under the second theory:  a widespread practice or custom.  They allege that the District has a "pattern and practice" of "retaliating against . . . parents who have communicated to and made demands upon Defendants concerning their children's education in the school district" by "making to DCFS bad faith reports against parents alleging that the parents have injured, abused, or neglected their children."  *See* First Am. Cplt., at ¶ 31 (Dckt. No. 20).

To prevail, Plaintiffs must show that the retaliatory searches and calls to DCFS were "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision."  *Phelan v. Cook Cty.*, 463 F.3d 773, 790 (7th Cir. 2006), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016); *see also Gable*, 296 F.3d at 537.

The Seventh Circuit has refused to adopt any "bright-line rules" for when a practice is so pervasive that it is "widespread."  *See Thomas*, 604 F.3d at 303 ("We do not adopt any bright-line rules defining a 'widespread custom or practice.'"); *Howell*, 2021 WL 405006, at *4 ("[W]e have not adopted bright-line rules regarding the quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*.").

A few guiding principles have emerged from the case law.  A plaintiff needs to come forward with more than a handful of incidents.  *See, e.g., Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident – or even three incidents – do not suffice."); *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003) ("When a

plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference.").

A practice is not widespread if it took place two, three, or four other times. *See, e.g., Palmer*, 327 F.3d at 595–96 ("Palmer's alleged personal knowledge of two incidents of misconduct by correctional officers in a period of one year certainly fails to meet the test of a widespread unconstitutional practice by the Jail's staff that is so well settled that it constitutes a custom or usage with the force of law."); *Gable*, 296 F.3d at 538 ("[T]hree incidents where vehicle owners were erroneously told that their vehicles were not at Lot 6 do not amount to a persistent and widespread practice.") (internal quotation marks omitted); *Grieveson v. Anderson*, 538 F.3d 763, 773–75 (7th Cir. 2008) (holding the plaintiff's allegations of four botched refills of his pain prescriptions did not prove a widespread unconstitutional practice).

The other incidents need to be similar to the situation at hand, too. The other incidents do not need to be identical, but they do need to be sufficiently similar to support an inference of a broader pattern. The greater the dissimilarity, the greater the skepticism that there is a single actionable municipal practice or custom. *See, e.g., Terry v. Cty. of Milwaukee*, 2018 WL 2567721, at *11 (E.D. Wis. 2018); *Tillman v. Burge*, 813 F. Supp. 2d 946, 978 (N.D. Ill. 2011) (explaining that in establishing the existence of such a policy or practice, it is insufficient to "splatter-paint a picture of scattered violations" through "collateral accusations of marginally related incidents") (citation omitted); *Howell*, 2021 WL 405006, at *7 (explaining that "the comparator[s] need not be perfect" but the "similarities" must be sufficient to "show a widespread practice").

Here, Plaintiffs support their allegation of a widespread practice by pointing to one (and only one) other lawsuit. In *Peoples v. Oswego Community School District*, a father and daughter allege that, after the father met with the principal of his daughter's school about "bullying, unfair treatment and unequal treatment toward his daughter," school officials made false or exaggerated reports to DCFS about his behavior and that DCFS responded by coming to the school, and strip searching the child without her father's permission. *See* Second Am. Cplt., at ¶ 9, in *Peoples v. Oswego Community School District*, No. 19-cv-568 (Dckt. No. 67).

The existence of another lawsuit is not enough to state a claim that a defendant maintains a widespread practice. Plaintiffs point to one other case, but one other case is not enough.

What's more, the allegations in the *Peoples* case are meaningfully different. In *Peoples*, the parents complained about bullying, rather than disability accommodations. And it was DCFS, not school officials, who conducted the illegal search. Furthermore, Plaintiffs don't allege that the two incidents took place at the same school, or that they involved similar school personnel, or that the allegations school officials made in the calls to DCFS were similar. A dissimilar allegation cannot support the "reasonable inference that the practice is so widespread so as to constitute a governmental custom." *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017).

Overall, the complaint does not allege sufficient factual material to state a claim that there is a widespread custom or practice within the meaning of *Monell*. Accordingly, the motion to dismiss Count III is granted.

### C. Punitive Damages

Finally, Defendants move to strike the demand for punitive damages. Rule 12(f) empowers a court to "strike from a pleading . . . any redundant, immaterial, impertinent, or

scandalous matter." *See* Fed. R. Civ. P. 12(f). Based on the text, Rule 12(f) is a tool to trim allegations that add no value or inflict gratuitous harm.

Defendants argue that the demand for punitive damages must be stricken because the statutes in question don't allow it. Substantively, that's correct. A court cannot award punitive damages under the ADA or the Rehabilitation Act. As the Seventh Circuit has held, "compensatory damages are available in private causes of action under the ADA and Rehabilitation Act," but "punitive damages are not." *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). Punitive damages are unavailable against a local government under section 1983, too. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (holding that "a municipality is immune from punitive damages under 42 U.S.C. § 1983").

But the unavailability of the remedy does not mean that the demand should be snipped from the pleading. "Rule 12(f) does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974–75 (9th Cir. 2010); *see also Sokolova v. United Airlines, Inc.*, 2019 WL 1572555, at *4 (N.D. Ill. 2019).

A better approach is to address the demand for punitive damages head-on, on the merits. After this ruling, the parties must confer about whether Plaintiffs intend to include a demand for punitive damages in the amended complaint. If so, Defendants can file a motion for judgment on the pleadings, or a motion for summary judgment, on that issue. *See* Fed. R. Civ. P. 12(c) (permitting a motion for judgment on the pleadings "[a]fter the pleadings are closed"); Fed. R. Civ. P. 56(b) (permitting a motion for summary judgment "at any time" until 30 days after the

close of discovery). An early motion for summary judgment on this issue will not preclude Defendants from filing another motion for summary judgment on other issues later in the case.

### Conclusion

Defendants' motion to dismiss is granted in part and denied in part. The Court grants the motion and orders a more definite statement about the claims advanced by AA. The Court denies the motion to dismiss the parents' retaliation claims (Counts I and II). The Court grants the motion to dismiss the *Monell* claim (Count III). The Court denies the motion to strike the demand for punitive damages.

Date: February 26, 2021

Steven C. Seeger
United States District Judge