**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

BRADLEY HAMILTON and )
ELIZABETH HAMILTON, )
individually, and as the parents )
and guardians of AA, a minor, and AA, )
)
      Plaintiffs, )    Case No. 20-cv-292
)
      v. )    Hon. Steven C. Seeger
)
OSWEGO COMMUNITY UNIT )
SCHOOL DISTRICT 308 and )
OSWEGO COMMUNITY UNIT )
SCHOOL DISTRICT 308 )
BOARD OF EDUCATION, )
)
      Defendants. )
_____)

## MEMORANDUM OPINION AND ORDER

Bradley and Elizabeth Hamilton sent their daughter, AA, to kindergarten in the Oswego school district. The child had a hearing disability, and received special care through an individualized education plan. But the parents wanted more care, and they requested additional accommodations in a meeting with school officials in January 2018. The meeting went poorly, and got tense.

The next day, AA showed up at school, but she did not go to her classroom. She sat on the floor in the hallway. School officials talked with her, and then spotted a large bruise in her hip area. AA said that she was in pain, too.

That discovery led to a meeting with the school nurse, and then with a social worker. AA could not explain how she had suffered the bruise. And worse yet, she made statements about getting touched in sensitive parts of her body by her father. The school called DCFS.

DCFS later cleared the family, finding no wrongdoing. The Hamiltons responded by bringing retaliation claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act against the Oswego Community Unit School District 308 and the Oswego Community Unit School District 308 Board of Education (collectively "the District").

As they see it, the District did not have a legitimate reason to search the child, or to call DCFS. In their view, the District searched AA and called DCFS to retaliate against the Hamiltons for requesting additional services. The Hamiltons also brought a state-law claim about missing records from the visit with the nurse.

After discovery, the District moved for summary judgment. For the reasons stated below, the motion for summary judgment is granted.

## Background

Plaintiffs Bradley Hamilton and Elizabeth Hamilton are the parents of AA, a child with a mild hearing impairment. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 5, 8 (Dckt. No. 144). In 2015, AA began attending school within Oswego School District 308. *Id.* at ¶¶ 7, 9. She started preschool as a three-year old.

Because of her hearing disability, AA had an individualized education plan (also called an "IEP"), which made her eligible for special education services from the District. *Id.* at ¶ 9. Part of the IEP involved annual meetings to re-evaluate the services. *Id.* at ¶¶ 10, 13.

In the fall of 2017, AA began kindergarten. *Id.* at ¶ 12. That year, AA was also scheduled for an IEP re-evaluation, which takes place every three years. *Id.* at ¶ 13.

The first meeting took place on January 11, 2018. *Id.* at ¶ 15. The attendees included District personnel, the Hamiltons, and an educational advocate for the Hamiltons. Everyone in

the IEP evaluation meeting received draft reports about AA's health and development before the meeting. *Id.* at ¶ 15.

The January 11 meeting did not go smoothly. The meeting became tense when the parties discussed the special services that AA needed. According to Elizabeth Hamilton, the meeting was a "negative space" and was "definitely not" civil. *See* Elizabeth Hamilton Dep., at 116:8-17 (Dckt. No. 145-1). The Hamiltons' advocate later described the District representatives' tone as "adversarial." *See* Carol Dimas Decl., at ¶ 11 (Dckt. No. 145-2).

The parties used different words to describe the meeting in their summary judgment filings, but they had the same flavor. The Hamiltons called the meeting "adversarial." *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 3 (Dckt. No. 153). The District called the meeting "long and, at times, stressful." *Id.* at ¶ 2.

Nevertheless, it seems that all parties at the meeting agreed on some things. Specifically, both the District representatives and the Hamiltons agreed that AA had continued eligibility for special education services based on her hearing impairment. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 16 (Dckt. No. 144). AA also received approval for "other health impairment, development delay, and occupational therapy." *Id.*

But in addition to AA's eligible services, AA's parents and their advocate requested that AA receive services for dyslexia. *Id.* at ¶ 18. So, the group had a second IEP evaluation meeting less than a week later, on January 16, 2018. *Id.* at ¶ 17. The group reconvened to determine whether AA would qualify for extra services based on dyslexia. *Id.*

During the second meeting, Oswego District personnel declined to label AA as "dyslexic" for purposes of special education services. *Id.* at ¶ 20. But they nevertheless agreed to provide her with additional reading intervention and services. *Id.* The District also left open

the possibility that the parties could meet again and revisit the issue if AA started falling behind. *Id.* at ¶ 21.

That same day, Elizabeth Hamilton signed off on a newly drafted IEP that District personnel prepared before the meeting. *Id.* at ¶ 23. But she still expressed frustration that the meeting was illegitimate, that the District had made up its mind before the meeting, and that the District had broken the law in some way. *See* Elizabeth Hamilton Dep., at 144:7 – 145:6 (Dckt. No. 145-1).

The next day, AA showed up to school as usual, but she did not want to go to her classroom after she got off the school bus. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 24–25 (Dckt. No. 144). While speaking with AA, various school officials – including a principal, Dr. Jennifer Groves, and the school psychologist, Tena Brazen – noticed something unusual and concerning.

At one point, AA lifted her arms to Groves and Brazen, exposing a large bruise on her body. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 7 (Dckt. No. 153). Both Groves and Brazen observed the bruise near AA's waist, above her waistband.[1] *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 27 (Dckt. No. 144); *see also* Jennifer Groves Dep., at 58:18 – 59:11 (Dckt. No. 140-26); Tena Brazen Dep., at 42:11-23 (Dckt. No. 140-29). When asked about the bruise, AA could not tell Groves or Brazen how she got it, or where it came from. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 28 (Dckt. No. 144).

---

[1] Plaintiffs contend that the bruise was on AA's "hip," while the District argues that the bruise was on her "abdomen." *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 26 (Dckt. No. 144). DCFS took a picture of the bruise on January 18, 2018, one day after the visit to the school nurse. *Id.* at ¶ 36. The record includes a copy of that photo of AA's bruise. It shows a large bruise above AA's pants and waistline. *See* Exhibit 44 (Dckt. No. 140-44). It looks like the bruise was above her hip, and then maybe a couple inches in the direction of her abdomen. Maybe the bruise was near the bottom of the ribcage. The exact placement is immaterial. The bruise existed, and it was on a part of her torso that her shirt would have covered, unless she raised her arms. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 8 (Dckt. No. 153).

Brazen took AA to the nurse's office after she said her bruise hurt.  *Id.* at ¶ 29.  Once again, AA could not tell the nurse, Dominique Acuff, what happened.  *See id.* at ¶ 28; *see also* Brazen Dep., at 45:21 – 46:1 (Dckt. No. 140-29).

Nurse Acuff typically saved notes to student files as part of her routine practice.  The record *does* include notes taken by the nurse on the day in question, meaning January 17, 2018. *See* Exhibit 45, at 13 of 19 (Dckt. No. 140-45).  Specifically, the record includes the Daily Log Report for the day in question.  *Id.*

The page shows a visit by three different students that day, as reflected by their Student ID numbers on the far left of the page.  *Id.*  The entry for AA appears in the middle of the page, with a student number that ends in x40.  *Id.*  The log shows that AA entered the nurse's office at 9:16 a.m., and left at 9:24 a.m.  *Id.*  The outcome stated:  "Return to Class."  *Id.*

The notes exist, but something was missing.  The Daily Log Report has an area where the nurse could write "Comments."  *Id.*  But there are no comments for AA's visit that morning.  *Id.* The "Comments" section is blank.  So, AA's file *does* have notes from the visit to the nurse for the day in question, but the file does *not* have any comments from the nurse.[2]  *Id.*; *see also* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 16 (Dckt. No. 153).

The parties explored the apparent absence of the comments during discovery.  As it turns out, Nurse Acuff apparently recorded her comments in the wrong spot.  She seems to have put her comments in the file of *another* student with the same initials as AA.  *Id.* at ¶ 17.

---

[2]  AA also visited the school nurse on January 19, 2018, two days after the first visit with the nurse.  The nurse wrote comments from that visit on January 19, 2018.  The comments referred to the status of AA's bruise:  "Also assess bruise on right hip to see that it is still healing – student denies knowing how it happened."  *See* Exhibit 45, at 10 of 19 (Dckt. No. 140-45); *see also* Kincaid Aff., at ¶ 14 (Dckt. No. 140-45) (identifying the document as a "medical audit report").

On the same page in the Daily Log Report, right below the entry for AA, there is an entry for another student (with a Student ID number ending in x54). The comments for *that* student read: "large bruise on left hip – document for potential DCFS call." *Id.*; *see also* Exhibit 45, at 13 of 19 (Dckt. No. 140-45).

Later that day, AA spoke to the school social worker, Dotty Mockenhaupt. Mockenhaupt asked AA about the bruising, and again, AA could not offer an explanation, but showed Mockenhaupt the bruise. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 30 (Dckt. No. 144).[3] Then, AA told Mockenhaupt that maybe her sister bit her. *Id.* at ¶ 31. AA then told Mockenhaupt that her father tickled her when she was in bed, both over and under her underwear. *Id.* AA demonstrated for Mockenhaupt that her father tickled her around her vagina and bottom. *Id.* at ¶ 33.

After the conversation with AA, Mockenhaupt called the Illinois Department of Children and Family Services to report AA's bruise and statements about her father. *Id.* at ¶ 34. Specifically, Mockenhaupt reported AA's father for potential sexual abuse, and filled out a Written Confirmation of Suspected Abuse/Neglect Report. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 22, 26 (Dckt. No. 153). In the written report, Mockenhaupt also noted that she had other evidence of abuse from about a month earlier (about AA's parents throwing things). *Id.* at ¶ 28; *see also* Dotty Mockenhaupt Dep., at 16:16 – 17:4 (Dckt. No. 140-28).

---

[3] Plaintiffs dispute most of the facts surrounding AA's conversation with Mockenhaupt. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 30–33 (Dckt. No. 144). But they cite no evidence to discredit Defendants' evidence about it. Instead, they point to evidence of an entirely separate conversation that AA had with DCFS investigators. That conversation with DCFS investigators doesn't discredit what AA allegedly told Mockenhaupt. The Court takes as true the facts about what AA told Mockenhaupt.

DCFS started an investigation into potential abuse by the Hamiltons. As part of that investigation, AA sat for a Victim Sensitive Interview ("VSI"). *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 35 (Dckt. No. 144).

AA's statements during the interview went back and forth. At times, AA made statements that raised the specter of child abuse. At other times, she seemed to walk it back, if not take it away.

During the interview, AA first told the interviewer that "daddy" tickled her vagina. *Id.* at ¶ 37; VSI Video, at 31:22 – 31:43[4] (Q: "So you tickle your vagina? Does anyone else ever tickle your vagina?" . . . A: "There's only one person who does it." Q: Who's that?" A: "Daddy."). She also demonstrated how her father tickled her bottom. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 39 (Dckt. No. 144); VSI Video, at 49:16 – 49:35.

Just a few minutes after telling the investigator about her father's apparent abuse, however, AA seemingly recanted. When the interviewer asked AA when her daddy tickles her vagina, AA responded by saying, "I didn't say that." *See* VSI Video, at 32:23 – 32:32. When asked again who tickles her vagina, AA then answered by saying, "mommy, daddy, my grandma, grandpa" all tickled her vagina. *Id.* at 32:37 – 32:51. Then the interviewer asked AA if she told "Miss Dotty [Mockenhaupt] that someone tickles her vagina," to which AA responded, "No." *Id.* at 35:00 – 35:07.

AA's recantation seemed to grow stronger later in the interview. At one point, AA told the interviewer, "My school tricked me, and said, 'Does you dad tickle you in your vagina?' and 'It's okay, nobody will get in trouble.' And they lied to me! Daddy got in trouble!" *Id.* at 38:33

---

[4] Plaintiffs submitted the video to the Court through a dropbox link. *See* Dckt. No. 140-32.

– 38:50.  The interviewer followed up by again asking AA if her dad tickles her vagina, and AA again shook her head, "No."  *Id.* at 38:53 – 38:56.

On March 6, 2018, DCFS determined that the report of potential abuse was unfounded. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 40 (Dckt. No. 144); Ex. 34 (Dckt. No. 140-34).

That conclusion did not surprise the Hamiltons.  By their account, AA's bruise was simply the result of child's play.  According to them, AA had simply run into the corner of a coffee table.  *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 6 (Dckt. No. 153); *see also* Elizabeth Hamilton Dep., at 131:19 – 132:8 (Dckt. No. 145-1).

After the DCFS report, AA missed six days of school without either parent calling the school to excuse her absences.  *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 144).  So once again, a District employee – this time Assistant Principal Noelle Fahey – called DCFS out of a concern for the safety of AA.  *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 25 (Dckt. No. 153); DCFS Contact Note (Dckt. No. 155-3).

The second call to DCFS was the last straw for the Hamiltons.  Soon after, the family withdrew AA from school in the District, and she started attending school in the neighboring Naperville School District.  *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 42 (Dckt. No. 144).

Then the Hamiltons sued the Oswego Community Unit School District 308 and its Board of Education.  The operative third amended complaint contains six counts.  This Court dismissed Count V (the *Monell* claim), so five claims remain.  *See* Mem. Opin. & Order, at 17–20 (Dckt. No. 37).

Counts I and II are retaliation claims under the Rehabilitation Act, 29 U.S.C. § 749 *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.  Elizabeth and Bradley Hamilton argue that they engaged in protected activity by requesting special services for AA,

and that the District responded by performing an illegal search of AA and by contacting DCFS in bad faith. *See* Third Am. Cplt., at ¶¶ 26–29 (Dckt. No. 109).

Counts III and IV are similar retaliation claims under the Rehabilitation Act and the Americans with Disabilities Act, brought on behalf of AA. *Id.* at ¶¶ 30–33.

Finally, Count VI is a claim under the Illinois School Student Records Act. *See* 105 ILCS 10/1 *et seq.* Plaintiffs allege that the District deleted a photograph and the note comments from the school nurse's visit with AA, in violation of a state law requiring the school to maintain student records. *Id.* at ¶¶ 40–69.

The District now moves for summary judgment on Counts I–IV and VI. *See* Mtn. for Summ. J. (Dckt. No. 138).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of

the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

### I. The Retaliation Claims

The District first claims that it is entitled to summary judgment on Counts I–IV because Plaintiffs can't prove retaliation under the Americans with Disabilities Act or the Rehabilitation Act.[5] *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 17–28 (Dckt. No. 140).

The ADA and the Rehabilitation Act "require[] schools to accommodate a student's disability, provide students with disabilities with equal opportunities to participate in extracurricular activities, account for disabilities when imposing disciplinary measures, and prohibit[] retaliation against students who request accommodations." *Thurmon v. Mount Carmel High Sch.*, 191 F. Supp. 3d 894, 898 (N.D. Ill. 2016).

The laws protect people with disabilities, and prohibit retaliation against anyone who invokes their rights. Put another way, "[b]oth the Rehabilitation Act and the ADA make it unlawful to retaliate for the exercise of rights conferred by those statutes." *Stanek v. St. Charles Cmty. Sch. Dist. No. 303*, 783 F.3d 634, 641 (7th Cir. 2015).

---

[5] The District tries to invoke immunity under the Illinois Abused and Neglected Child Reporting Act ("ANCRA") for the constitutional claims, but as this Court already explained in a prior opinion, state law immunity doesn't apply to federal claims. *See* Mem. Opin. & Order, at 16 (Dckt. No. 37) (citing *Sebesta v. Davis*, 2016 WL 232380, at *8 (N.D. Ill. 2016), *aff'd*, 878 F.3d 226 (7th Cir. 2017) ("Because ANCRA is a state statute, it cannot protect Defendants from Sebesta's federal constitutional claims.")). Additionally, Plaintiffs' state law claim is about Nurse Acuff's alleged deletion of photos and notes from AA's visit on January 17; the claim is *not* about any report of abuse to DCFS. ANCRA immunity doesn't apply to that claim, either.

To defeat a motion for summary judgment, a plaintiff must show that a reasonable juror could conclude that he or she suffered retaliation for trying to exercise their statutory rights. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 763–64 (7th Cir. 2016). Plaintiffs can proceed under either the direct or indirect method of proof. *See Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

Here, Plaintiffs seek to prove their case through the indirect method. *See* Pls.' Resp. to Mtn. for Summ. J., at 6 (Dckt. No. 143) ("Without direct evidence (i.e., an admission) of retaliation, the *McDonnell Douglas* burden shifting analysis applies."). The indirect method has three steps.

First, Plaintiffs have the initial burden to present a *prima facie* case of retaliation. *See Cassimy v. Bd. of Educ. of Rockford Pub. Sch.*, 461 F.3d 932, 938 (7th Cir. 2006); *A.C. ex rel. J.C. v. Shelby County Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013). Plaintiffs must establish that (1) they engaged in activity protected under the ADA or the Rehabilitation Act; (2) they suffered an adverse action; and (3) there was a causal connection between the protected activity and the adverse action. *See C.B. v. Bd. of Educ. of City of Chicago, Dist. 299*, 624 F. Supp. 3d 898, 920 (N.D. Ill. 2022); *see also A.C.*, 711 F.3d at 697. "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *A.C.*, 711 F.3d at 697 (quotation omitted).

Second, if Plaintiffs make that showing, then the burden shifts to the District to show some "non-invidious reason" for the adverse action. *See Dickerson*, 657 F.3d at 601; *see also A.C.*, 711 F.3d at 697.

11

Third, if the District makes that showing, then the burden shifts back to Plaintiffs to demonstrate that the District's proffered reason is pretextual. *See Dickerson*, 657 F.3d at 601; *see also A.C.*, 711 F.3d at 697.

The Court will march through all three steps.

A.      **Plaintiffs' *Prima Facie* Case**

The first step is making a *prima facie* case of retaliation. Again, Plaintiffs must show a protected activity, adverse action, and causation. *See C.B.*, 624 F. Supp. 3d at 920.

The District seems to concede that the Hamiltons engaged in protected activity under the ADA and the Rehabilitation Act. *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 18 (Dckt. No. 140) ("The District does not contest that the Hamiltons and the District had engaged in a lengthy IEP meeting to determine what special education services AA would be provided."). The District does not argue that there was no protected activity. *See id.* ("Plaintiffs allege and the District does not dispute that they were engaged in the protected activity of '. . . attempting to secure a free and appropriate education for AA and advocation for special education services and accommodations for AA's disability.'") (quoting Pls.' Third Am. Cplt., at ¶ 13).

That concession is not surprising. A request for disability accommodations is exactly the kind of activity protected by the two statutes. *See Trahanas v. Nw. Univ.*, 64 F.4th 842, 856 (7th Cir. 2023) ("To have engaged in an activity protected by the ADA, the [plaintiff] 'must have asserted [her] rights under the ADA by either seeking an accommodation or raising a claim of discrimination due to [her] disability.'") (quoting *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814–15 (7th Cir. 2015)); *see also A.C.*, 711 F.3d at 698 ("Both this circuit [the Sixth Circuit] and most others agree that requests for accommodation are protected acts.") (citing *Cassimy v. Bd. of Educ. of Rockford Pub. Sch.*, 461 F.3d 932, 938 (7th Cir. 2006)).

12

But the District does argue that Plaintiffs did not satisfy the other two parts of a *prima facie* case: an adverse action, and causality. The Court takes each requirement in turn.

An action is "adverse" if it "would dissuade a reasonable person from engaging in protected activity." *Henry v. Milwaukee County*, 539 F.3d 573, 586 (7th Cir. 2008). By way of analogy, in the related context of employment discrimination, an "adverse employment action is that which would 'dissuade a reasonable worker from making or supporting a charge of discrimination.'" *See Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (cleaned up); *see also Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911–12 (7th Cir. 2022); *Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022). But "[f]or purposes of retaliation claims, 'adverse action' encompasses a greater swath of actions than with discrimination claims." *See Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 509 (7th Cir. 2020).

Here, the record includes evidence of two potential adverse actions. First, Mockenhaupt called DCFS to report Bradley Hamilton for suspected abuse. Second, Nurse Acuff searched AA's person during the examination at school. Both acts could constitute adverse actions to support a retaliation claim.

A call to DCFS to report potential child abuse is no small matter. Quite the opposite – it's a big deal. A call to DCFS would put a family on the receiving end of a child abuse investigation. And once the investigation starts, there is no good outcome, even if DCFS concludes that the whole thing is meritless.

At best, the family would have to endure an uncomfortable, stressful investigation by a government agency about the intimacies of the home. A DCFC investigation can feel invasive and accusatory, and might make the parents feel defensive and threatened, even if they did

13

nothing wrong and even if the DCFS investigator acts in a gentle, professional manner. At worst, the investigation could lead to a loss of custody. Having a child taken away may not be a parent's worst nightmare, but it's not far from the ballpark.

No parent wants a visit from DCFS. Parents might be less likely to request accommodations for their children if school officials respond by calling DCFS. If parents think that a call from DCFS is on the table if they speak up, they might clam up. They might not advocate for the accommodations that their children need.

As another court put it, "Having a government official appear at their door armed not only with the power to take their disabled child away but also with allegations that they are actively . . . abusing that child would surely be enough to dissuade many reasonable parents from seeking accommodations at school." *A.C.*, 711 F.3d at 698.

Other courts around the country have found that reporting potential child abuse qualifies as an adverse action. *See Genn v. New Haven Bd. of Educ.*, 219 F. Supp. 3d 296, 323 (D. Conn. 2016); *Lawton v. Success Academy Charter Sch., Inc.*, 323 F. Supp. 3d 353, 366 (E.D.N.Y. 2018) (at the motion to dismiss stage); *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 149 (2d Cir. 2002) (same).

The search of the body of a child without parental consent could constitute an adverse action, too. Any body search is potentially sensitive, and the sensitivities are even greater when the search involves a child. Children are more vulnerable than adults, and they are less likely to stick up for themselves if something crosses the line.

Privacy interests come into play whenever a physical search of a child takes place. Parents rightly feel protective of their children. And for the parents, it can inflict a sense of harm and a loss of control knowing that another adult is doing something involving the child's body.

14

In the Fourth Amendment context, courts have recognized the seriousness of a body search of a child. *See Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993) ("'[A] search of a child's person . . . no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy.'") (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 337–38 (1985)) (Fourth Amendment context); *see also Michael C. v. Gresbach*, 526 F.3d 1008, 1014 (7th Cir. 2008) ("[P]hysical examinations conducted by child welfare caseworkers, that include visual examinations of portions of a child's body which are normally covered by clothing, implicate Fourth Amendment concerns."). As this Court already concluded, an invasive search of a five-year-old child is "exactly the kind of thing that might dissuade parents from engaging in protected activity." *See* Mem. Opin. & Order, at 13 (Dckt. No. 37). If the search of a child could raise Fourth Amendment concerns, it is hard to see why the search of a child would not constitute an adverse action, too.

The last piece of a *prima facie* case is causation. Plaintiffs must show a causal relationship between the protected activity and the adverse action. Once again, the record includes enough evidence to support an inference that the request for accommodations by the Hamiltons caused the call to DCFS, and caused the search by the nurse.

The timing is especially significant. Mockenhaupt called DCFS *the day after* the January 16 meeting with the Hamiltons. *See* Exhibit 25 (Dckt. No. 140-25) (email sent to IEP team before January 16 meeting, including Mockenhaupt). The close proximity between the meeting (on January 16) and the call to DCFS (on January 17) supports an inference of causation.

Temporal proximity between a protected activity and an adverse action "is rarely sufficient to show that the former caused the latter." *See Coleman v. Donahoe*, 667 F.3d 835, 860–61 (7th Cir. 2012). But the passage of a short span of time can "raise an inference of a

15

causal connection" when there is other evidence of causation. *Id.*; *see also Loudermilk v. Best Pallet Co.*, LLC, 636 F.3d 312, 315 (7th Cir. 2011) ("Occasionally, however, an adverse action comes so close on the heels of a protected act that an inference of causation is sensible."); *see also B.H. ex rel. L.H. v. Obion County Bd. of Educ.*, 2019 WL 6718674, at *6 (W.D. Tenn. 2019) (concluding that a report to child services that came the day after the plaintiff requested disability accommodations showed causation). The less time that passes, the greater the likelihood that two events are connected. The closer in time, the tighter the link, the stronger the inference.

The evidence also supports the existence of an adversarial relationship. At the very least, the Hamiltons and the District weren't seeing eye-to-eye, and weren't getting along.

The record reveals that the Hamiltons and the District had two meetings during the week before AA's visit to the nurse on January 17, 2018. The meeting on January 11 did not go smoothly. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶¶ 2, 3 (Dckt. No. 153). And the meeting on January 16 was tense, if not downright contentious. *See id.* at ¶¶ 4–5; E. Hamilton Dep., at 116:8-17 (Dckt. No. 145-1) (describing the January 16 meeting as a "negative space" and "definitely not" civil); Dimas Decl., at ¶ 11 (Dckt. No. 145-2) (describing the January 16 meeting as "adversarial"); DCFS Contact Note (Dckt. No. 140-35) (DCFS case worker noting that Assistant Principal Fahey "admits that before the hotline report was made to DCFS that there was already tension between mom and the school because mom was seeking services for her daughter").

The Hamiltons wanted AA to be labeled "dyslexic," but the District refused. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 18, 20 (Dckt. No. 144). Elizabeth Hamilton testified that she accused the District of breaking the law during that meeting. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 5 (Dckt. No. 153).

16

A bad meeting could lead to a bad reaction. The adversarial history could support an inference of a later adverse action.

From a personnel standpoint, there was a connection between the meetings and the call to DCFS, too. Mockenhaupt was at the IEP meetings. *See* Dotty Mockenhaupt Dep., at 61:7 – 62:8 (Dckt. No. 140-28). She called DCFS the day after the second meeting. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 34 (Dckt. No. 144). The continuity strengthens the inference of a connection.

Of course, "[s]uspicious timing alone rarely establish[es] causation." *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015). Even so, summary judgment is inappropriate where other evidence of pretext coexists with suspicious timing. *See Parker v. Brooks Life Science, Inc.*, 39 F.4th 931, 937 (7th Cir. 2022).

The timing, the contentiousness, and the consistency of the characters are enough to get over the hump. The adverse action took place the day after a contentious meeting about the need for more accommodations, and some of the same people were involved. Putting them together, the time, the tone, and the cast can support a reasonable inference of causation under the ADA and the Rehabilitation Act. *See A.C.*, 711 F.3d at 699; *see also Magyar v. Saint Joseph Reg. Med. Ctr.*, 544 F.3d 766, 773 (7th Cir. 2008) (concluding that suspicious timing plus evidence of a defendant's "defensive and irritated" tone was sufficient to raise an inference of causation); *cf. D.V. ex rel. B.V. v. Pennsauken Sch. Dist.*, 247 F. Supp. 3d 464, 471 (D.N.J. 2017) ("The conclusion that a jury cannot find a causal connection between plaintiffs' advocacy and the calls to DYFS is also furthered by the fact that plaintiffs have not shown defendants had any animosity towards plaintiffs because of their advocacy.").

The same conclusion applies to the search by the nurse, too. The search by the nurse took place the day after the contentious meeting.

What's more, the IEP meeting involved some of the same people who played a role in the search. Dr. Groves and Tena Brazen attended the contentious IEP meeting on January 16, 2018. *See* Exhibit 25 (Dckt. No. 140-25) (email sent to IEP team before January 16 meeting, including Mockenhaupt). Both women played a role or were present during the search of AA on January 17, 2018, too. *See* Brazen Dep., at 44:14-16 (Dckt. No. 140-29) (Q: "Did you then proceed to Ms. Acuff's office with [AA] and Dr. Groves?" A: "Yes.").

Viewing the evidence as a whole, in a light favorable to the non-movant, the record contains enough evidence to make a *prima facie* case of retaliation.

## B.     Non-Retaliatory Reason for the Call to DCFS and the Search

Next, the burden shifts to the District to show a non-retaliatory reason for the reports to DCFS and the search of AA.

The District offers a simple reason for the call and the search. The District believed that AA's health and safety were at risk, based on the bruise and AA's statements to Mockenhaupt. As the District sees it, the facts justified – if not *mandated* – a call to DCFS and a search of AA. *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 27 (Dckt. No. 140) ("[T]he District's personnel in the case at bar are mandated reporters . . . . The photograph of AA's bruise and her subsequent statements during her VSI are sufficient to establish that the DCFS call made by Ms. Mockenhaupt had a basis in fact.").

The Court agrees that the District has come forward with enough evidence to show a non-retaliatory reason for its decisions. The District has carried its burden.

18

AA showed up to school on January 17, 2018, with a large bruise. *See* Exhibit 44 (Dckt. No. 140-44); Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶¶ 6–8 (Dckt. No. 153). The existence of the bruise is undisputed. In fact, the Hamiltons offered an explanation of how AA suffered the bruise. According to them, AA "hit her hip on a coffee table running away from her younger sister." *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 6. The parents offered evidence that they "took AA to her pediatrician, who saw the bruise and prepared an office note that Elizabeth provided to the school nurse." *Id.*

The bruise was near her hip. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 26 (Dckt. No. 144); *see also* Jennifer Groves Dep., at 58:18 – 59:11 (Dckt. No. 140-26); Tena Brazen Dep., at 42:11-23 (Dckt. No. 140-29). Two District employees – a principal (Dr. Groves) and a school psychologist (Brazen) – spotted the bruise when AA lifted her arms. *Id.*

AA said that it hurt. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 29 (Dckt. No. 144). She couldn't explain how she got the bruise. *Id.* at ¶ 28. And at the time, AA was not herself. When she got off the bus, she didn't go to her classroom. *See id.* at ¶¶ 24–25. AA was sitting on the floor before school started. *See* Pls.' Statement of Additional Facts, at ¶ 7 (Dckt. No. 144).

True, bruises can come from a lot of things. Children have the energy and the inclination to engage in activities that can lead to bruises. Child abuse was only one of the potential explanations – but it *was* a potential explanation. Child's play can cause bruises, but so can child abuse.

There is also evidence that AA indicated to District employees that her father sexually abused her. *See* Mockenhaupt Dep., at 22:11 – 23:16 (Dckt. No. 140-28); Brazen Dep., at 63:18 – 64:17 (Dckt. No. 140-29). One could debate the strength of the evidence, especially after

19

considering potential ambiguities and/or retractions. But given the statements by AA (especially early on), the District had reason to worry about potential abuse.

State law mandated that the District report the potential child abuse to DCFS. Under Illinois law, "educational personnel" must "immediately report to the Department when they have reasonable cause to believe that a child known to them in their professional or official capacities may be an abused child or a neglected child." *See* 325 ILCS 5/4. "Educational personnel" includes "administrators and certified and non-certified school employees." *Id.*

Even without the mandatory reporting, the evidence supports the notion that the District searched AA and called DCFS out of concern about potential child abuse. The fact that DCFS ultimately concluded there was no abuse doesn't mean that the concerns motivating the report were insufficient. *See M.L. v. Williamson County Bd. of Educ.*, 772 F. App'x 287, 293 (6th Cir. 2019) ("But just because a report ultimately proves false does not mean that the concerns motivating the report were fictitious. To show a 'lack of basis in fact,' the parents would need more than DCS's conclusion that no abuse had occurred.").

Altogether, the District has carried its burden to show a non-retaliatory reason for its actions. The District encountered a bruised child who was in pain, who could not explain her injury. Her later statements about potential abuse raised concerns, and prompted action. *See A.C.*, 711 F.3d at 701 (concluding that a mandated reporter law and potential threats to a child's health and welfare were enough to sustain the defendant's non-retaliatory reason for reporting parents to welfare workers).

### C.     Pretext

At the last step, the burden flips back to Plaintiffs.  The District has offered a legitimate, non-retaliatory reason for its actions, so Plaintiffs must produce evidence that the reason is pretextual.  *See Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 596 (7th Cir. 2017).

A district court must decide whether the evidence about pretext shows "such weaknesses, implausibilites, inconsistencies, incoherencies, or contradictions in the [defendant's] asserted reasons that a reasonable person could find it unworthy of credence."  *Parker*, 39 F.4th at 938 (quotations omitted).  In some cases, "the sheer weight of the circumstantial evidence of [retaliation] makes it 'more likely than not' that the [Board's] explanation is a pretext, or a coverup."  *M.L.*, 772 F. App'x at 294 (alterations in original) (quotation omitted).

Plaintiffs offer nine reasons why, in their view, the District has offered pretextual reasons for calling DCFS and searching AA.  One of the reasons is about the bruise.  A few of the reasons are about the examination by the nurse.  The rest of the reasons are about other conduct by District employees.

Specifically, Plaintiffs offer the following list of reasons why the District's explanation is pretextual:

(1)     AA's bruise was not conspicuous;

(2)     Nurse Acuff deleted the photograph that she took of AA during her exam;

(3)     Nurse Acuff removed AA's pants during the exam;

(4)     The notes from Nurse Acuff's exam of AA were either deleted or undocumented in the first place;

(5)     Nurse Acuff determined there was no abuse;

(6)     District staff did not remove AA from the classroom on January 17 to implement the IEP, as the District suggests, because the new IEP had not been signed or implemented yet;

(7)      District employees sent AA home from school on January 17, 2018, even though they reported her as unsafe to DCFS;

(8)      Mockenhaupt reported abuse from December 2017 that she did not believe was abuse at the time; and

(9)      District employees did not report any abuse until after the IEP evaluation meeting.

*See* Pls.' Resp. to Mtn. for Summ. J., at 9–10 (Dckt. No. 143).

At the summary judgment stage, the question is not whether the reasons were pretextual. The question is whether a reasonable jury could find them pretextual.  That is, the question is whether there is a genuine issue of material fact about whether the District offered pretextual explanations for its conduct.  When reviewing the record, the Court "must consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation."  *Parker*, 39 F.4th at 936 (quotation omitted) (citing *Rowlands v. United Parcel Serv.– Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018)).

After reviewing the record as a whole, and drawing all inferences in Plaintiffs' favor, the Court concludes that no reasonable jury could find that the reasons were a "pretext, or a coverup."  *M.L.*, 772 F. App'x at 294.

The Court will address Plaintiffs' reasons, largely in order.

***The Bruise***.  Plaintiffs begin by pointing to the fact that the bruise was not "conspicuous" (Reason #1).  *See* Pls.' Resp. to Mtn. for Summ. J., at 9 (Dckt. No. 143).  That's not much of a reason to find that the District gave pretextual reasons for calling DCFS and searching AA.

Several District witnesses testified that they saw the bruise.  They explained how they saw the bruise, too.  AA raised her arms, which lifted her shirt and exposed the injury.

It is undisputed that AA had a large bruise. And it is undisputed that several school officials spotted it. Given that reality, the location of the injury does not do much to suggest that the District gave a phony reason for its actions.

***The Examinations by the Nurse***. The next four reasons involve the examination by the nurse.

Two of the four reasons involve the preservation of evidence. Plaintiffs contend that the nurse took a picture of AA's bruise, but deleted it (Reason #2). Plaintiffs also argue that the notes by the nurse went mysteriously missing (Reason #4).

It is hard to see how a missing photograph could support an inference of pretext (Reason #2). For starters, Plaintiffs failed to offer evidence that the photo ever existed. Plaintiffs' brief repeatedly proclaims that the nurse took a picture of AA. *See* Pls.' Brf., at 1, 4, 8, 10, 12 (Dckt. No. 143). But the citations are either missing, or are off point.

For example, on page 8, Plaintiffs say that Defendants "took photographs of her," and then cite paragraph 39 of the statement of additional facts. *Id.* at 8. But that paragraph does not mention a photo. *See* Pls.' Statement of Additional Facts, at ¶ 39 (Dckt. No. 144). As another example, on page 12, Plaintiffs cite their own complaint, which is not evidence. *See* Pls.' Brf., at 12 (Dckt. No. 143) (citing paragraph 44 of the third amended complaint).

Plaintiffs' Rule 56.1 statements do not support the existence of a photo taken by the nurse, either. Plaintiffs did not offer admissible evidence about the photo in their response to Defendants' statement of facts. *See* Pls.' Resp. to Defs.' Statement of Facts (Dckt. No. 144). Plaintiffs also did not offer admissible evidence about the photo in their statement of additional facts. *See* Pls.' Statement of Additional Facts (Dckt. No. 144).[6]

---

[6] In paragraph 9 of Plaintiffs' statement of additional facts, Plaintiffs stated that Elizabeth Hamilton heard AA talk about getting her picture taken. It reads: "AA told her therapist and younger sister her

23

Maybe there is evidence in the record somewhere that the nurse took a picture.  But if so, Plaintiffs have the responsibility to cite it and support it if they want the Court to rely on it. Plaintiffs didn't, so the Court won't.

Even if the nurse did take a picture that later disappeared, the disappearance of a picture cannot support an inference that the District is giving a pretextual reason for the call and the search.  Maybe the nurse took a picture of the bruise, but if so, it is hard to see how a picture could support a finding of pretext.  The existence of the *picture* is disputed, but the existence of the *bruise* is not.

The picture does not seem probative when the parties agree that AA *did have a bruise*. Again, the Hamiltons offered an explanation for the bruise – AA ran into a coffee table.  *See* Pls.' Statement of Additional Facts, at ¶ 6 (Dckt. No. 144).  And the bruise apparently was serious enough to both mention it to the pediatrician, *and* write a note explaining the bruise to the

---

clothes were removed in the nurse's office.  Elizabeth heard AA telling her younger sister when her younger sister was starting kindergarten, I had to go to the nurse's office, my clothes were removed, my pants were put back on before a picture was taken, and don't trust anyone at school."  *See* Pls.' Statement of Additional Facts, at ¶ 9 (Dckt. No. 144) (citations omitted).  As support, paragraph 9 cites to Elizabeth Hamilton's deposition testimony, where she stated: "[AA] said she had people – she had to go into the nurse's office.  Her clothes were removed.  And then before they took a picture, they had her put her pants back on."  *See* Elizabeth Hamilton Dep., at 154:17-22 (Dckt. No. 145-1).  That testimony would be inadmissible at trial to prove the truth of the matter asserted.  Elizabeth Hamilton's testimony about AA's out-of-court statement about a photo is inadmissible if offered for the truth of the matter asserted.  *See* Fed. R. Evid. 801(c); *see also* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 9 (Dckt. No. 153) ("Elizabeth Hamilton testified that she did not personally hear AA make any statements to her therapist about having her clothes removed by the nurse, and, as such, this statement is inadmissible hearsay.").  Later, in paragraph 39, Plaintiffs' statement of additional facts quoted a recorded conversation between AA and her sibling.  In that conversation, AA said:  "They made me take off all my clothes in front of the school nurse. . . .  They showed pictures of my boo-boo because you were chasing me."  *See* Pls.' Statement of Additional Facts, at ¶ 39 (Dckt. No. 144).  In that recording, AA did not clearly state that the nurse took her picture.  Even if she had, Elizabeth Hamilton could not testify about what AA said, if the substance of the testimony is offered for its truth.  AA could testify, but the recording is not a sworn statement.  Also, Plaintiffs quoted the recording, but did not file it – even though this Court expressly ordered them to do so.  *See* 8/1/23 Order (Dckt. No. 154).  In sum, the statement is an unsworn, out-of-court statement that is offered for its truth, without authentication, that did not see the light of day on the docket despite a Court Order.

24

school.  *Id.* ("Elizabeth [Hamilton] took AA to her pediatrician, who saw the bruise and prepared an office note that Elizabeth provided to the school nurse.").

Plaintiffs admit that AA had a bruise on her right hip.  *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 26 (Dckt. No. 144).  They do not deny that the bruise was "large."  *Id.*  Plaintiffs admit that four District officials – Dr. Groves, Ms. Brazen, Nurse Acuff, and Ms. Mockenhaupt – saw the bruise on January 17, 2018.  *Id.* at ¶ 27.  They admit that AA went to the school nurse "after she said that her bruise hurt."  *Id.* at ¶ 29.

The record does include a picture of the bruise, too.  DCFS took a picture of the bruise on January 18, 2018, the day after the visit to the school nurse.  *See* Exhibit 44 (Dckt. No. 140-44); *see also* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 36 (Dckt. No. 144).  True, the picture was not taken the same day as the visit to the school nurse.  But it was pretty close in time.  And the picture does give a good sense of the size, location, and severity of the bruise.

Against that backdrop, it is hard to see what inference a jury could draw from the fact that the picture from the visit to the school nurse on January 17, 2018 is missing.  A picture might shed more light on the appearance of the bruise.  But no one thinks that the picture would call into question the existence of the bruise, because everyone agrees that a large bruise existed.

In a similar vein, the absence of "Comments" in the notes prepared by the nurse does not shed much light, either (Reason #4).  The nurse testified that she took notes in something called eSchool.  *See* Pls.' Statement of Additional Facts, at ¶ 16 (Dckt. No. 144).  The notes exist, and are in the record.  *See* Exhibit 45, at 13 of 19 (Dckt. No. 140-45).

But the entry for AA on January 17, 2018 is missing "Comments."  *Id.*; *see also* Acuff Dep., at 42:17 – 43:19 (Dckt. No. 140-30).  So the notes were *incomplete*.

During discovery, the parties investigated the Daily Log Report for January 17, 2018, the day of the visit to the school nurse. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 17 (Dckt. No. 153). Again, the entry for AA appeared in the middle of the page, with a Student ID number ending in x40.

Right below, the Daily Log Report had an entry for another student, with a Student ID number ending in x54. The entry for that other student had a timestamped entry from 9:18 a.m. to 9:22 a.m. *Id.* And it says: "large bruise on left hip – document for potential DCFS." *Id.*

As it turns out, AA and that other student share the same initials. *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 17 (Dckt. No. 153).

So, it is easy to see why a nurse might add comments for AA in the file of the next student *with the same initials*. It sheds a lot of light on why the file of AA (meaning the Plaintiff here) does not have any comments in her file about the day in question. It looks like the nurse wrote the comments and put them in the wrong file – meaning in the file of another child with the same initials. Those comments describe the same situation at the same time on the same day.

At times, Plaintiffs seem to concede that the nurse made a mistake, and put her comments for AA in the notes for the other student. Plaintiffs quoted the Daily Log Report for January 17, 2018, with the statement "large bruise on left hip – document for potential DCFS call." *See* Defs.' Resp. to Pls.' Statement of Additional Facts, at ¶ 17 (Dckt. No. 153). Plaintiffs then added: "Whoever input this entry *added it to the wrong student*." *Id.* (emphasis added).

Viewing everything in a light favorable to the Hamiltons, maybe the comments for the other "AA" were, in fact, comments for the *other* AA, not Plaintiff AA. Maybe – just maybe – two kids with the same initials went to the school nurse on the same day, at the same time, with

the same type of injury, on the same part of the body. Maybe the nurse made comments for the other "AA," but didn't make comments for Plaintiff AA or destroyed them.

Even if that's what happened (how many kids went to the nurse with a large bruise on their hip that morning, and got referred to DCFS?), it is hard to see how the non-existence of the notes for Plaintiff AA could support a finding of pretext. Again, there is no dispute that AA had an injury, and went to the nurse.

Maybe Plaintiffs suspect that the nurse wrote something down that is inconsistent with the District's theory of the case. For example, imagine a world in which the school nurse wrote: "I see no bruise and I think everyone at the school is out to get the Hamiltons. Let's call DCFS and get back at them!"

That's a theory, not a fact. A plaintiff must marshal evidence at the summary judgment stage. Summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005). "A party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it.'" *Caisse Nationale de Credit v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (citation omitted).

Speculation about the content of a document does not count as admissible evidence. *See Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022) ("[I]nferences 'that that are supported by only speculation or conjecture will not defeat a summary judgment motion.'") (citation omitted). Here, it is hard to see how the non-existence of the comments could support a finding by a reasonable jury that the District offered phony reasons for doing what it did.

It is a stretch to go from the non-existence of the comments to an inference that the District gave phony reasons for calling DCFS after searching AA. Again, the existence of the bruise is undisputed, so it is hard to see how the non-existence of the comments could advance the ball toward the pretextual goal line.

Next, Plaintiffs point out that AA's "pants were removed" during the visit to the nurse (Reason #3). *See* Pls.' Resp. to Mtn. for Summ. J., at 10 (Dckt. No. 143). It is hard to see how the removal of the clothing could make the reasons pretextual. Plaintiffs contend that the bruise was under the clothing. (As an aside, the bruise was above her waistline.) If the bruise was under the clothing, then removing the clothing is understandable if the goal was seeing the bruise.

Maybe the removal of the clothing would matter if Plaintiffs' theory of the case was that AA had no injury. In that case, Plaintiffs could argue that the report of physical abuse was phony, because the District looked for an injury and found none.

But here, everyone agrees that AA suffered a large bruise. The existence of an injury is undisputed. Given that reality, the removal of the clothing makes no difference. The fact that the nurse removed clothing when searching the child does not support the notion that the District is making everything up.

At this point, the question is not whether the nurse *should have* removed AA's pants. The question is whether the removal of her pants could support an inference that the District gave pretextual reasons for the call to DCFS. It is difficult to see how removing her pants could support a conclusion by a reasonable jury that the District had bad motives for the call.

Finally, Plaintiffs argue that the nurse expressed the view that nurse "determined there was no abuse" (Reason #5). *See* Pls.' Resp. to Mtn. for Summ. J., at 9–10 (Dckt. No. 143); Pls.'

28

Statement of Additional Facts, at ¶ 16 (Dckt. No. 144) (citing the deposition of the nurse). That's not a fair reading of the deposition.

The nurse did not express the view that AA did not suffer abuse. For starters, the nurse testified that she could not remember AA coming into her office on the day in question:

> Q:     Have you ever had [AA] in your office?
>
> A:     I don't specifically recall.
>
> Q:     Have you ever taken a photograph of [AA]?
>
> A:     I don't recall.
>
> *     *     *
>
> Q:     Do you ever remember an occasion where Ms. Brazen, B-r-a-z-e-n, brought AA into your office?
>
> A:     No.

*See* Acuff Dep., at 23:8-13, 23:24 – 24:3 (Dckt. No. 140-30).

And then, Plaintiffs' counsel asked the nurse if she suspected that AA was abused. In response, the nurse testified that that *wasn't her job*:

> Q:     Have you ever suspected that [AA] had been abused or neglected?
>
> A:     That's not my job really.  No.

*Id.* at 24:4-6.

So, the nurse did not express the view that AA had not suffered abuse. She testified that it wasn't her role to make that sort of determination. She was a caregiver, not an investigator. That testimony cannot support the notion that abuse did not exist, because the nurse offered no views on the existence or the non-existence of abuse. That's "not [her] job." *Id.*

**Other Reasons**.  The Hamiltons offer a few other reasons why, in their view, the District gave fake reasons for the call and the search. The reasons do not carry much weight.

29

Plaintiffs argue that the District removed AA from class twice in one day to implement the IEP, even though the new IEP had not been signed or implemented yet (Reason #6).  It is hard to know what to make of that argument.

Plaintiffs seem to be referring to the fact that the school pulled AA from her class on the afternoon of January 17 so that she could see the social worker.  *See* Pls.' Resp. to Mtn. for Summ. J., at 2 (Dckt. No. 143) ("Something was rotten at [] Elementary that day.  When AA was removed from her kindergarten classroom for the second time on January 17, 2018, she was not taken to the nurse's office. . . .  So, for her second round of questioning, AA was taken somewhere else and questioned by someone else.").

The fact that the school took AA to see the social worker does not cast doubt on why the District called DCFS.  The record confirms that the school asked AA to visit the social worker after AA had a visit with the nurse about her bruise.

Next, Plaintiffs point out that the District sent AA home on January 17, even though they believed that AA was in "immediate physical danger" (Reason #7).  *See* Pls.' Resp. to Mtn. for Summ. J., at 10 (Dckt. No. 143).  The idea seems to be that the District would not have sent AA home if they genuinely believed that she was in danger.

That argument doesn't get Plaintiffs very far, either.  Was it an option for the District to detain AA, and prevent her from going home?  Did the District have that authority?  Plaintiffs make no such showing.  The fact that the District did not do *more* – and detain AA at school – is not probative without a showing that the District could have done more.

DCFS presumably has the power to remove children from imminent danger.  And the District called DCFS.  If anything, the call to DCFS is consistent with a belief that the District felt concerned about potential abuse.

Next, Plaintiffs argue that the District "later reported abuse based on events they did not think were abuse at the time" (Reason #8). *See* Pls.' Resp. to Mtn. for Summ. J., at 10 (Dckt. No. 143). Plaintiffs points to two paragraphs of their Statement of Material Facts, but only one paragraph (paragraph 28) seems on point. *Id.* There, Plaintiffs argue that "[t]he social worker [Mockenhaupt] also documented that she was aware of prior evidence of abuse/neglect dating back to December 18, 2017. However, the social worker did not report that suspected abuse to DCFS." *See* Pls.' Statement of Additional Facts, at ¶ 28 (Dckt. No. 144).

The argument seems to be that Mockenhaupt knew facts in December 2017 that could give rise to an inference of abuse. But Mockenhaupt did nothing. She did nothing, that is, until *after* the IEP meeting on January 16, 2018. That's when she wrote a report that also covered potential abuse in December. The argument seems to be that Mockenhaupt didn't really believe in January 2018 that abuse took place in December 2017, because Mockenhaupt knew the facts in December 2017 but did nothing.

That theory falls apart after reading the report itself, meaning the report that Plaintiffs cite in their statement of additional facts. The report says: "Reporter states that [AA] has disclosed domestic violence within the home where Bradley (dad) will throw things and yell; Bradley reportedly flipped a table in December 2017." *See* Report (Dckt. No. 155-9).

The report does not say that Mockenhaupt knew about the December incidents *in December*. It does not reveal when Mockenhaupt learned what happened. The report also begins with the phrase "[a]n investigation was initiated on 1/17/18," which makes it sounds like Mockenhaupt learned the information in January. *Id.* The timing of her knowledge is up in the air.

Maybe there is other evidence in the record supporting the notion that Mockenhaupt knew about the December events in December. But if so, Plaintiffs did not cite it. It is not this Court's job to look for it and hunt it down. *See Albrechtsen v. Bd. of Regents of Univ. of Wisconsin Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Even if Mockenhaupt did know about the December incident in December, that knowledge would not shed much light on why Mockenhaupt acted in January. Mockenhaupt had more information in January than she had in December. Under Plaintiffs' theory, Mockenhaupt knew about the father throwing things, yelling, and flipping tables in December. But in January, Mockenhaupt saw AA with a physical injury, and heard AA make statements consistent with sexual abuse. It's apples and oranges.

Finally, Plaintiffs point out that the District did not report any abuse until after the IEP meeting on January 16, 2018 (Reason #9). *See* Pls.' Resp. to Mtn. for Summ. J., at 10 (Dckt. No. 143). That fact is not probative in light of the chronology. The District spotted the large bruise on January 17, 2018. And AA made statements about potential sexual abuse for the first time on January 17, 2018. The fact that the District acted after January 16 does not seem probative because the District learned new information on January 17.

\*     \*     \*

The evidence does not look stronger when viewed together, either, from a cumulative case perspective. Sometimes bits and pieces of evidence might not look like much, but they paint a picture when viewed as a group. Thin pieces of twine can make a strong rope.

But not always. Sometimes adding weak evidence to weak evidence leads to a grand total of weak evidence. Stringing together evidence that can't carry weight can lead to a case that can't carry weight. It creates a long string of weak strings.

After viewing the record as a whole, and drawing all reasonable inferences in favor of Plaintiffs, the Court concludes that the record cannot support a finding of pretext. The District searched AA after several employees spotted a large bruise. The District called DCFS after looking at the injury, and after hearing AA make statements that suggested sexual abuse.

Plaintiffs strung together a bunch of reasons why the District's reasons were phony. But after taking a close look, the reasons are not strong enough to support a finding by a reasonable jury that the District gave pretextual reasons for searching AA and calling DCFS.

## II.     The Illinois School Student Records Act

The final claim involves the Illinois School Student Records Act ("ISSRA"). Plaintiffs allege that the District violated the statute by deleting notes and photos from AA's visit with Nurse Acuff on January 17, 2018. *See* Third Am. Cplt., at ¶¶ 40–69 (Dckt. No. 109).

In the motion for summary judgment, the District argues that notes and a photograph from a nurse's visit do not constitute "school student records" as defined by the Act. *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 28–32 (Dckt. No. 140).

"[T]he ISSRA manifests the legislature's intent to create a parental right of access to matters contained in their children's school records, and to permit them the right to contest the accuracy, relevancy and propriety of those records." *John K. v. Bd. of Educ. for Sch. Dist. No.*

*65, Cook County*, 504 N.E.2d 797, 804 (Ill. App. Ct. 1987). The statute also empowers "[a]ny person injured by a . . . violation of this Act [to] institute an action for damages." *See* 105 ILCS § 10/9(b).

The Act defines a "school student record" as "any writing or other recorded information concerning a student and by which a student may be individually identified, maintained by a school or at its direction or by an employee of a school, regardless of how or where the information is stored." *See* 105 ILCS 10/2(d). A so-called "masked record, which deleted individual identifying information," does not qualify as a school student record under the Act. *See Bowie v. Evanston Cmty. Consol. Sch. Dist. No. 65*, 538 N.E.2d 557, 560 (Ill. 1989). So the Act protects a document that identifies a student, and requires preservation of that record. But the Act does not protect a document that removes any individually identifying information.

Whether a document constitutes a school record is a purely legal question. *See Sieck ex rel. Sieck v. Oak Park-River Forest High Sch. Dist. No. 200*, 807 F. Supp. 73, 77 (N.D. Ill. 1992) ("The determination of whether or not the suspension memorandum is a school record presents a purely legal question; the proper construction of the Illinois School Student Records Act.").

The Court will begin with the notes. Notes can be school records, depending on the content. Even so, Plaintiffs have no claim because there is no evidence that the District failed to preserve notes from the visit with the nurse on January 17, 2018.

Again, the notes exist, and are in the record. *See* Exhibit 45, at 13 of 19 (Dckt. No. 140-45). True, the notes do not have any content in the section below "Comments." *Id.* Even so, Plaintiffs offered no evidence that the nurse prepared comments, and that the District deleted them.

34

The comments aren't there, but that's not enough. Plaintiffs needed to offer evidence that the District created a record, and then failed to preserve it. And here, the portion below "Comments" is simply blank.

The District also offered a plausible explanation for why the entry does not include any comments for AA. Again, right below the entry for AA, the Daily Log Report showed an entry for another student, with the same initials. It reads: "large bruise on left hip – document for potential DCFS call." *See* Exhibit 45, at 13 of 19 (Dckt. No. 140-45).

To get to trial, Plaintiffs needed to come forward with evidence that could support a finding by a reasonable jury that the District destroyed the comments. Plaintiffs did not offer evidence that the comments ever existed in AA's file. Plaintiffs did not offer evidence that anyone from the District destroyed them, either. And Plaintiffs did not offer any evidence to rebut the simple explanation by the District: the nurse simply saved her comments in the file for another student. The evidentiary cupboard is bare.

The District produced the notes, albeit without any comments. Indeed, Plaintiffs themselves cite the notes about AA's visit produced by the District, and seem to admit that the notes were saved, but to the wrong student's file. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 17 (Dckt. No. 153) (citing Exhibit 45, at 13 of 19 (Dckt. No. 140-45)).[7] Plaintiffs offer no evidence that the District deleted any notes. The Court grants summary judgment to the District on this claim about the notes from Nurse Acuff.

_____

[7] Plaintiffs argue that the Court should strike the affidavit of Heather Kincaid and the accompanying exhibits showing the missing notes from AA's file because "Ms. Kincaid was not disclosed as a witness in this case." *See* Pls.' Resp. to Mtn. for Summ. J., at 13 (Dckt. No. 143). The argument seems a bit disingenuous, however, considering Plaintiffs themselves relied on Ms. Kincaid's affidavit and the attached exhibits in their own statement of facts. *See* Defs.' Resp. to Pls.' Statement of Facts, at ¶ 17 (Dckt. No. 153) (citing Exhibit 45, at 13 of 19 (Dckt. No. 140-45)). The Court denies the invitation to strike the affidavit and its accompanying materials.

The last issue involves the photo by the nurse. And again, Plaintiffs have failed to come forward with admissible evidence that the photo existed.

As an aside, this Court independently located a statement in a deposition transcript that the nurse took a picture. *See* Brazen Dep., at 46:7-21 (Dckt. No. 140-29). Plaintiffs did not point to this evidence in their Rule 56.1 filings. This Court should not have to hunt-and-peck through the record looking for evidence. But the Court did want to note that it independently stumbled upon it, when taking a long, solitary walk through the record. It's waived.

Putting that aside, Plaintiffs have no claim even if they had offered evidence that the nurse took a picture. The District argues that the photograph – if it exists at all – is not a "school record" for purposes of the Act, and claims it is entitled to summary judgment as a matter of law. *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 28–32 (Dckt. No. 140).

The District argues that any photo of AA from Nurse Acuff's exam would not qualify as a school record because Plaintiffs have no evidence that the photograph would include AA's face to identify her. *Id.* at 30.

The Act does not cover any and every record that a school prepares about a student. Instead, the Act protects a record "concerning a student and by which a student may be individually identified." *See* 105 ILCS 10/2(d). A picture of someone's face is probably a record (if it's not super close), but a picture of the back of someone's knee probably isn't. Most of us can't be identified by the back of our knees.

Here, Plaintiffs have the burden of proof, which means that Plaintiffs have the burden to show that the District deleted a record that falls within the Act. To satisfy that burden, Plaintiffs must show that the District took a photo of AA that would allow her to be "individually identified." *See* 105 ILCS 10/2(d).

Plaintiffs have not carried that burden. There is no evidence in the record about the content of any such picture. That is, there is no evidence that the nurse took a picture of AA that would allow her to be individually identified.

If anything, the evidence is one-sided on the other side of the ledger. Nurse Acuff testified that when she takes photos of students, she makes sure the photos included "no identifying features of the student ever." *See* Acuff Dep., at 17:24 – 18: 4 (Dckt. No. 140-30).

Simply put, there is no evidence in the record that the District took, but failed to preserve, any records within the meaning of the Act. The Court grants summary judgment to Defendants on the claim under the Illinois statute.

## III. Punitive Damages

The last remaining issue is punitive damages. Based on the Court's ruling about the claims, the issue is moot. Punitive damages are off the table because all of the claims are out the door.

Putting that aside, the District argues that Plaintiffs are not entitled to punitive damages because, as a municipal entity, the District is immune from punitive damage awards. *See* Defs.' Mem. in Support of Mtn. for Summ. J., at 32–33 (Dckt. No. 140). Plaintiffs offer no response.

The Court agrees with the District. Municipal entities – like the District here – are immune from punitive damages. *See Barnes v. Gorman*, 536 U.S. 181, 189 (2002) ("Because punitive damages may not be awarded in private suits brought under Title VI of the 1964 Civil Rights Act, it follows that they may not be awarded in suits brought under § 202 of the ADA and § 504 of the Rehabilitation Act."); *see also Kramer v. Banc of Am. Secs., LLC*, 355 F.3d 961, 965 (7th Cir. 2004) (holding that punitive damages are not available in an ADA retaliation claim); *Johnson v. City of Chicago*, 2015 WL 1918161, at *4 n.5 (N.D. Ill. 2015) (holding that the

37

plaintiff could not seek punitive damages against a municipal entity in his ADA and Rehabilitation Act retaliation claims); 745 ILCS 10/2-102 ("Notwithstanding any other provision of law, a local public entity is not liable to pay punitive or exemplary damages in any action brought directly or indirectly against it by the injured party or a third party.").

The Court grants judgment for the District on Plaintiffs' request for punitive damages.

## Conclusion

For the reasons above, the Court grants Defendants' motion for summary judgment.

Date: September 30, 2023

_____
Steven C. Seeger
United States District Judge